**Talia DISTLER, In the Matter of Roy Distler and Eleanor Distler, infants under the age of 16, Petitioner,**

v.

**Kenneth DISTLER, Respondent.**

**Civil No. 98–4273 (JBS).**

United States District Court, D. New Jersey.

Oct. 29, 1998.

Robert D. Arenstein, Michielle Spector, Law Offices of Robert D. Arenstein, Teaneck, NJ, for Petitioner.

Michael A. Taylor, Taylor, Boguski & Greenberg, Mount Laurel, NJ, for Respondent.

### *OPINION*

SIMANDLE, District Judge:

This matter comes before the Court on an application for attorneys fees and costs under 42 U.S.C. § 11607(b)(3) following petitioner's successful petition before this Court for the return of her children to the State of Israel under the Hague Convention on the Civil Aspects of International Child Abduction, 42 U.S.C. § 11601, *et seq.*[1] For the reasons stated below, this Court will grant the application for necessary costs as requested by the petitioner, albeit with a few modifications.

### I. BACKGROUND

The undisputed facts are as follows. Talia and Kenneth Distler were a married couple living in the State of Israel with their two minor children, Roy, age ten, and Eleanor, age eight. On August 11, 1998, respondent Kenneth Distler took his children, with the knowledge and consent of petitioner Talia Distler, to New Jersey for a two week visit with the children's grandmother, respondent's mother. Midway through the vacation, Kenneth Distler told Talia Distler that he would be keeping the children and taking a job in the United States. On the date that the children were supposed to return to Israel, respondent's attorney, Michael A. Taylor, Esq., sent a letter to petitioner's attorney in Israel, Shmuel Moran, Esq., notifying petitioner that the children would not be returning. Mr. Taylor refused to tell petitioner where the children were exactly, but assured her that they were still in New Jersey. In fact, Mr. Taylor engaged in advocacy with Mr. Moran, indicating that his client was within his rights to retain custody of the children and explaining that his client planned on making a life for himself and his children in the United States, for their mother had financially and emotionally abandoned them in Israel. (See Arenstein Certif. Ex. A.)

Petitioner did get to speak to her children often in their absence at respondent's mother's home in New Jersey. In early September, Mr. Distler removed them from New Jersey; his attorney, Mr. Taylor, provided their new telephone number in Pennsylvania

---

1. On December 1, 1991, the treaty known as "the Convention on the Civil Aspects of International Child Abduction, Done at the Hague on 25 October 1980", available at 51 Fed.Reg. 10503 (1986), entered into force between the United States and Israel. Congress implemented this treaty in the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. § 11601 *et seq.* (1988), and through U.S. Department of State regulations at 22 C.F.R. § 94. The purpose of the treaty and ICARA was to provide a prompt means of returning children who have "been wrongfully removed or retained" through international abductions. 42 U.S.C. § 11601(a)(3) and (a)(4). A parent seeking return of children to the children's habitual residence through the Hague Convention could file an application with the country's Central Authority and petition any court where the child is located when the petition is filed. 42 U.S.C. §§ 11603 and 11606. By agreement between the National Center for Missing & Exploited Children and the U.S. Department of State, Office of Children's Issues, which acts as the Central Authority for the United States under the Convention, the National Center processes applications seeking the return of or access to children abducted to the United States. 22 C.F.R. § 94.2. The remedies under the Convention and ICARA are not exclusive, but simply act as one method for return of children. 42 U.S.C. § 11603(h). A party who successfully petitions under ICARA and the Convention may, under Article 26 of the Convention, ask the court to order the respondent to pay petitioner's necessary expenses in connection with the petition. *Id.* at § 11607(3).

to Mrs. Distler's Israeli attorney on September 9, 1998, without any additional information as to their actual whereabouts and without any offer to provide for the safe return of the children.[2] During that time, unbeknownst to petitioner, respondent had found a job in the Poconos region of Pennsylvania, enrolled his children in school, rented a home, and obligated himself to monthly payments for an $11,000 Jeep. According to respondent, it was his intention to support his children here with an income he never could have made in Israel.

Meanwhile, on September 1st, petitioner and her Israeli counsel had contacted the offices of Robert Arenstein, Esquire, for help in returning her children to Israel, paying Mr. Arenstein a $10,000 retainer for his work. (*Id.* at Ex. B.) Mr. Arenstein and his associate, Michielle Spector, Esquire, retained an Investigative Service to help locate respondent and the children and prepared the necessary pleadings, affidavits, and memoranda in support of this case.

On September 11, 1998, Mr. Arenstein filed a Notice of Petition and Petition for Return of Children with this Court. On September 15, this Court ordered respondent's counsel, Mr. Taylor, to serve as a special agent for service of process on the respondent, whose exact whereabouts were still unknown to petitioner and, according to Mr. Taylor, only vaguely known by respondent's counsel. The Court entered an order compelling respondent Kenneth Distler to appear and to show cause why the children should not be returned and set a hearing for September 17, 1998.

Both petitioner and respondent appeared on that date. Petitioner Talia Distler had flown overnight from Israel, arriving at court directly from the airport. Respondent Kenneth Distler, having been served with process through his attorney, obeyed the Court's order to appear. Through the eventual negotiation of the parties at this hearing, this Court entered a consent order whereby the children would be returned to their habitual residence under the Treaty, namely their home in Israel. The order also allowed respondent to keep the children several more days, through the end of Rosh Hashana (the Jewish New Year), until they would fly home with their mother. Petitioner spent those few days with friends in New York while respondent spent the Jewish New Year with his children. The children were in fact returned without a problem. Only this dispute regarding attorneys' fees and costs remains to be decided.

## II. DISCUSSION

Now before this Court is petitioner's motion for attorneys fees and costs pursuant to 42 U.S.C. § 11607(b)(3). This section of the International Child Abduction Remedies Act ("ICARA") provides:

> Any Court ordering the return of a child pursuant to an action brought under section 4 shall order the respondent to pay the necessary expense, incurred by or on behalf of the petitioner, including court costs, legal fees, foster home or other care during the course of the proceedings in the action, and transportation costs related to the return of the child, unless the respondent establishes that such an award would be clearly inappropriate.

*Id.* See also *Roszkowski v. Roszkowska,* 274 N.J.Super. 620, 638, 644 A.2d 1150, 1159 (N.J.Super.Ch.1993) (noting that the court, as a sanction against the abducting parent, may order the respondent to "pay legal and travel expenses and costs incurred in locating the child ..."). Under this provision, petitioner seeks reimbursement for a total of $9,562 in counsel fees and costs for Mr. Arenstein's firm, $2,560 in counsel fees for Shmuel

---

**2.** It is not apparent that Mr. Taylor's September 9th letter to Mr. Moran in Israel reached either Mr. Moran or Mr. Arenstein before these pleadings were prepared. The facsimile notation on Mr. Taylor's September 9, 1998 letter indicates that it was not transmitted to Mr. Moran's office until September 10th at 10:36 a.m., which is 6:36 p.m. Israeli time, after the end of the business day. Petitioner's counsel had already prepared the necessary pleadings for return of children by that time. On September 23rd, Mr. Moran's office faxed to Arenstein a copy of Taylor's letter, according to a second notation. In any event, as noted, providing a new telephone number without other information did nothing to resolve the issue of respondent's wrongful removal of the Distler children.

Moran, and $1,823 for petitioner in repayment for plane tickets, all of which petitioner seeks to have remitted through Mr. Arenstein's office. As the following discussion will explain, petitioner's motion will be granted in part.

Respondent argues that petitioner is not entitled to the bulk of what she asks for because almost none of what was done was necessary. It is respondent's contention that much of this could have been avoided through discussion with him after he sent letters to the Israeli counsel and without 100 pages of pleadings and exhibits prepared by petitioner's counsel and filed in this Court. I could not disagree with respondent more.

This sudden abduction of petitioner's children created an emergency situation; in handling an emergency, one takes no chances. When plumbing springs a leak in the middle of the night, one does not hesitate to pay the plumber $100 an hour to fix the emergency instead of waiting to pay $50 an hour in the morning when more damage has been done. Similarly, when the worry is not plumbing, but one's children, there are no doubts as to what one must do. ICARA was created exactly for situations like this. The steps petitioner took to assert her ICARA rights in this exigent situation were completely reasonable, and most of the expenses can be designated as necessary, for the following reasons.

### A. Attorneys' Fees and Costs

■ While there are not many cases involving fees after a child abduction under ICARA, there are enough cases to guide our approach in determining whether fees can be called necessary. The "lodestar" approach is the proper method for determining the amount of reasonable attorneys' fees. *See Freier v. Freier*, 985 F.Supp. 710, 712 (E.D.Mich.1997). Under this approach, the Court should multiply the number of hours reasonably expended on the litigation by the reasonable hourly rate. The reasonableness of the rates is a function of the geographic area and the level of expertise of the attorney. The number of hours may be cut due to duplication or padding. *Id.*

■ Here, Mr. Arenstein and his associate, Ms. Spector, are very experienced in handling matters in this specialized field of international child abduction. (Arenstein Certif. at 7–10.) [3] Given their level of expertise and the general rates in New Jersey, I find that Mr. Arenstein's hourly rate of $350 is reasonable and commensurate with the upper level of litigation counsel in specialized matters in this federal court. The hourly rate of $250 for Ms. Spector, however, is somewhat high for a fourth-year associate who also did not have actual case management responsibility. Recognizing, however, her experience and skill in this area of international law, an hourly fee of $200 will be approved for purposes of reimbursement in this case. These hourly rates of $350 and $200, respectively, presume both knowledgeability and efficiency in ICARA litigation; it follows that the reasonableness of the time expended for the legal services must also be judged in accordance with the rather demanding expectations of performance by counsel, as now discussed.

■ First, I find that petitioner (who has already paid her attorneys for their services) is entitled to reimbursement of fees for Mr. Arenstein's work. His 5.6 hours were efficient and necessary for consultation with his client and Israeli counsel, for participation in the pre-hearing telephone conference with the court and respondent's counsel, and for his appearance in court.

■ Second, petitioner is also entitled to reimbursement for most of the fees requested for Ms. Spector's work, though I am reducing this amount for several reasons.[4] A

---

**3.** Mr. Arenstein has been working in family law for over twenty years, and he has handled 165 cases under the Hague Convention. Ms. Spector has spent three of her four years of law practice in matrimonial and family law, handling 10 cases under the Hague Convention.

**4.** At the outset I must note that Ms. Spector has done excellent work in this case, preparing the pleadings and writing a helpful memorandum of law which enabled the court to quickly address this case in a previously unfamiliar area of law. Further, she coordinated the tri-partite applications necessary for court intervention under ICARA, which were the Israeli Ministry of Jus-

number of tasks performed by Ms. Spector, such as phone calls with friends of petitioner, preparation of certificates of service and FedExs, etc., totaling 5.6 hours, are not necessarily tasks for an attorney, and these could have been performed by her legal assistant, who bills at $100 an hour. I am further reducing the two hours Ms. Spector spent in my courtroom accompanying Mr. Arenstein, who alone presented the argument and conducted the negotiations, as that time was duplicative; no other overlap in efforts between petitioner's counsel has been detected. There has been no objection to the two hours spent preparing the attorneys' fee application, which could have been avoided through the respondent's cooperation and recognition of petitioner's right to reasonable reimbursement, and I am including that time in the fee award as a necessary expense. Accordingly, I am ordering the respondent to pay fees in the amount of $1,960 for 5.6 hours of work by Mr. Arenstein at the rate of $350 an hour, $4,140 for 20.7 hours by Ms. Spector at $200 per hour, and $560 for 5.6 hours that could be charged at the legal assistant's rate. I am also ordering respondent to repay petitioner the $527.50 in reimbursable itemized expenditures associated with this case as necessary costs. The total reimbursement for legal services and costs reasonably incurred through Mr. Arenstein's firm is thus $7,187.50.

### B. Foreign Attorneys' Fees

 Petitioner has also asked this Court for $2,560 in fees that she has already paid to Shmuel Moran (actually, to be exact, it was 10,000 Israeli shekels) for services which he provided. Mr. Moran has provided this Court with an affidavit listing the services which he performed. In accordance with *Grimer v. Grimer*, No. 93–4086–DES, 1993 WL 545261 (D.Kan. Dec.8, 1993), I find that the bulk of these fees are necessary legal expenses, under 42 U.S.C. § 11607(b)(3).

Respondent urges this Court to look at *Freier*, in which the Eastern District of Michigan refused to award $13,235.63 for time spent by an Israeli advocate who wrote an 11 page letter on Israeli law submitted to the court because the Israeli attorney was merely a consultant in the case. *Freier*, 985 F.Supp. at 713. In the case at bar, however, Mr. Moran did more than just act as a consultant. He acted as petitioner's legal counsel by giving her legal advice of her rights under the Hague Convention, helping her retain counsel in the United States, preparing a Legal Opinion, putting together affidavits with petitioner's Israeli relatives and friends for potential use in the case before this Court, and more. He also obtained, through the Israeli Ministry of Justice, the request of Israel's "Central Authority" under the Treaty for international judicial assistance to repatriate the Distler children. As Mr. Moran performed legal services, petitioner is entitled to reimbursement for his fees. However, as Mr. Moran also performed services not germane to the case directly before this Court, namely, preparing work that may potentially go before an Israeli court in a custody case,[5] I am cutting his stated fee by one third and requiring respondent to reimburse only for Mr. Moran's legal services that were necessary for the present case. Thus, I am ordering the respondent to pay the petitioner $1,706.70 for legal services performed by Mr. Moran.

### C. Plane Tickets

Finally, petitioner requests that respondent repay her for the cost of a plane ticket to the United States for herself and the cost of changing her children's plane tickets so that they could return with her as ordered by this Court. Under 42 U.S.C. § 11607(b)(3), petitioner is entitled to transportation costs related to returning the children to their habitual home. *See also Freier*, 985 F.Supp.

tice, the United States Department of State, and the filing of the petition and supporting documentation in this federal court.

**5.** The Treaty and the implementing statute at 42 U.S.C. § 11601(b)(4) do not confer jurisdiction upon this court to determine child custody disputes, but instead to determine whether the child

has been removed from his or her habitual residence and, if so, to order restoration of that arrangement, pending whatever future course domestic divorce or custody litigation may take. Accordingly, nothing herein should be construed as addressing the eventual issue of custody of these children.

at 714; *Grimer,* 1993 WL 545261, at *1–2. Remarkably, respondent's attorney argues that "Ms. Distler had ulterior motives to fly to New York, as apparently she spent three (3) of her five (5) days in the States visiting with friends." (Resp.'s Ltr. Opp'n. to Fees.) The hollowness and the brass of such a statement do not escape me; the reason that petitioner was required to linger with friends before returning with her children to Israel was so *respondent* could spend more time with his children over the Jewish New Year as the parties had agreed and as this Court had ordered.

It was indeed necessary for petitioner to fly to the states to attend the court-ordered hearing and, having succeeded at the hearing, to take her children home.[6] I am therefore ordering respondent to repay petitioner $1,239 for her own plane ticket and $584 for the cost of changing the children's tickets.

D. *Ability to Pay*

Respondent further urges this Court to reduce his obligation for reimbursement of counsel fees and costs due to his inability to pay. He works as a miller at a moderate income, albeit at three times his Israeli income according to his attorney, and his only valuable asset is his share of the equity in the Distlers' home in Israel, which was received as a gift to the couple from Talia Distler's parents. (Resp.'s Let. Opp'n to Fees at pp. 1–2.) The statute, as noted above, gives this court the discretion to reduce or eliminate a respondent's obligation for attorneys' fees and other costs where a full award "would be clearly inappropriate." 42 U.S.C. § 11607(b)(3). *See Rydder v. Rydder,* 49 F.3d 369, 373 (8th Cir.1995); *Berendsen v. Nichols,* 938 F.Supp. 737, 739 (D.Kan. 1996). Mr. Distler's financial condition has been taken into account. The Court finds that he has a substantial asset in Israel from which petitioner can collect her fees and that his obligation to make this reimbursement to

petitioner for the reasonable and necessary expenses his conduct has caused should be satisfied from his assets if it cannot be paid from current income. The Court finds that Kenneth Distler has the ability to pay this award and that there is nothing "clearly inappropriate" about entering this judgment against him.

III. *CONCLUSION*

Petitioner has requested that the costs and fees be sent directly to the office of Robert D. Arenstein, but given that she has already paid Mr. Arenstein and Mr. Moran for their work, I am instead ordering that all sums be paid directly to petitioner. For the reasons stated above, it is my order that respondent remit the following amounts:

| | |
|---|---|
| Attorneys' fees and costs through Mr. Arenstein's firm: | $ 7,187.50. |
| Attorneys' fees through Mr. Moran: | $ 1,706.70. |
| Travel Costs: | $ 1,823.00. |
| Total: | $10,717.20. |

---

**6.** Respondent also mistakenly notes that this Court had said it was not necessary for petitioner to appear in this Court and that he himself could have brought the children back. To the contrary, this Court most certainly would have ordered petitioner's presence if it had been guaranteed that respondent, whose whereabouts were

unknown at the time when the Order to Show Cause was entered, would appear at the hearing. By flying to New Jersey from Israel on short notice to attend the hearing, petitioner acted promptly and reasonably to assert her ICARA rights upon the hope that the hearing would indeed go forward on September 17.