[No. B169792. Second Dist., Div. Five. July 13, 2004.]

Guardianship of ARIANA K., a Minor.
MIKE K., Petitioner and Appellant, v.
BARBARA K. et al., Objectors and Respondents.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts III.B. and C.

COUNSEL

Link K. Schwartz for Petitioner and Appellant.

Randy W. Medina for Objectors and Respondents.

OPINION

**TURNER, P. J.—**

## I. INTRODUCTION

Mike K. appeals from an order appointing Kyriaki K. and Barbara K. as the guardians of Ariana K. Mike is Ariana's father. Kyriaki is Ariana's grandmother. Barbara is Ariana's maternal aunt. Ariana's mother, Despina K., is deceased. In the published portion of this opinion, we will address the issue of whether the trial court had subject matter jurisdiction to enter the challenged visitation and custody orders. As will be noted, we conclude the trial court had subject matter jurisdiction. More specifically, we hold that the Hague Convention on the Civil Aspects of International Child Abduction of October 25, 1980, T.I.A.S. No. 11670,[1] did not deprive the trial court of subject matter jurisdiction to adjudicate the guardianship dispute. In the unpublished portion of the opinion, we explain why the present appeal must be dismissed pursuant to the fugitive disentitlement doctrine. Finally, we will deny the monetary sanctions request of Barbara and Kyriaki.

## II. BACKGROUND

### A. The January 5, 1998, Guardianship Petitions

On January 5, 1998, Kyriaki and Barbara filed separate petitions for temporary guardianship and appointment of a guardian for Ariana. In support of the petitions, Kyriaki and Barbara filed declarations in which they presented the following evidence. Prior to December 1996, Despina and Mike lived together but were unmarried. Ariana was born in January 1996. At the time of Ariana's birth, Despina was diagnosed with ovarian cancer. In December 1996, Despina and Ariana moved into Barbara's home where Kyriaki also lived. Mike apparently was either unwilling or unable to care for

---

[1] All future references to the Hague Convention, an article, or the preamble are to relevant portions of the Hague Convention on the Civil Aspects of International Child Abduction.

Despina and Ariana, who was an infant. During Despina's illness, she applied for and received public assistance. On December 17, 1997, after living with Kyriaki and Barbara for a year, Despina died. According to Kyriaki and Barbara, they were Ariana's primary caretakers. Ariana was bonded to Kyriaki and Barbara. Ariana had been residing with Kyriaki and Barbara for a year. Mike only had sporadic visits with Ariana prior to Despina's death. Mike, who had significant contacts in Greece, had threatened to "kidnap" Ariana.

On January 12, 1998, Mike and Kyriaki and Barbara entered into a "Conciliation Court Agreement and Stipulated . . . Parenting Plan." The agreement provided in part that Mike was to have care and responsibility for Ariana except for those times when Kyriaki and Barbara would be caring for the child. A schedule was established for Kyriaki and Barbara which provided for visitation on alternate weekends. The January 12, 1998, agreement provides that Kyriaki and Barbara could have additional periods of visitation with Mike's consent.

On March 11, 1998, the parties filed a document entitled "Stipulation Modifying Conciliation Court Agreement." The stipulation provides that: Kyriaki and Barbara would withdraw their petition to be appointed Ariana's guardians; Mike was responsible for Ariana's care except during the times specified for visitation with Kyriaki and Barbara; and Kyriaki and Barbara had specified visitation rights with Ariana.

### B. The 2002 Guardianship Petitions

On September 5, 2002, Barbara and Kyriaki filed an ex parte application for temporary guardianship of Ariana and a request for issuance of an order to show cause re contempt. Barbara presented the following evidence in support of the temporary guardianship petition. Barbara and Kyriaki had attempted in 1998 to become Ariana's guardians. They did so in response to Mike's threat to take Ariana to Greece and leave her there. During the first two months of the stipulated visitation, Mike requested that Barbara and Kyriaki keep Ariana for longer periods of time than specified on the conciliation court agreement. (With Mike's consent, this was permissible under existing court orders.) Ariana would cry when he picked her up from these periods of visitation. Barbara declared, "It was always [Ariana's] fear that she would not be returned to us." At some point, Mike permitted Ariana to move into Barbara's home. Kyriaki, and Barbara's two children, lived there with Ariana. While living with Barbara and Kyriaki, Ariana attended Sierra Madre Community Nursery School from 1998 through June 2001. Barbara

and Kyriaki paid for Ariana's tuition. Mike did not involve himself in any activities at Ariana's school. Barbara and Kyriaki provided for all of Ariana's daily needs and expenses. Barbara and Kyriaki: provided medical insurance for Ariana; took the youngster to the doctor and dentist; assisted the child with homework; attended Ariana's school activities; enrolled the child in extracurricular activities; and took charge of the youngster's religious education. Mike did not participate in any of these activities, nor did he provide any financial support for Ariana.

At the end of July 2002, Mike gave Barbara and Kyriaki 24 hours notice to pack Ariana's belongings for a trip to Greece. Ariana was chewing her fingernails and anxious. This was because Ariana feared she would not be returned to Barbara and Kyriaki. Ariana had to be forcefully taken onto the airplane by Mike. According to Barbara, Mike said that he would return with Ariana in 10 days.

On August 4, 2002, Barbara telephoned Greece to try to speak with Ariana. Mike was angry because Ariana continued to cry as he was taking her to Greece. Mike would not allow Barbara to speak with Ariana. When Mike came back to California on August 10, 2002, Ariana was not with him. Mike said that he had left Ariana in Greece.

Represented by counsel, Mike appeared at the hearing on the two applications. The court continued the temporary guardianship application and order to show request to October 17, 2002, for a hearing. On October 15, 2002, Mike filed a declaration in opposition to the two applications filed by Barbara and Kyriaki. Mike declared that he agreed to allow Barbara and Kyriaki to have visitation rights. Until 2002, he never tried to keep Ariana from seeing Barbara and Kyriaki. Mike denied that he had threatened to take Ariana to Greece after Despina died. Rather, according to Mike, Kyriaki and Barbara did not accept that he was Ariana's father. According to Mike, Ariana lived exclusively with him through June of 2002. Ariana only attended nursery school while visiting Kyriaki and Barbara. Ariana attended kindergarten from September 2001 through May 2002 as indicated by Barbara and Kyriaki. Mike said, though, that he involved himself in Ariana's activities.

Mike declared that he had always provided medical and dental insurance for Ariana until June 2002, when he changed employment. Barbara agreed to provide insurance coverage for Ariana at that time. Ariana was fully insured in Greece where she is residing with her paternal grandparents. Mike regularly took Ariana to a pediatrician in Culver City. Mike declared that when Ariana stayed regularly with Barbara and Kyriaki, they began to make

excuses for not showing up at places such as a church where he would usually pick up his daughter. Mike denied forcibly taking Ariana onto the airplane to Greece. Mike admitted that she appeared to be afraid but said that Ariana told him that she was being kidnapped. Mike attributed Ariana's fears to statements made by Barbara and Kyriaki.

On October 17, 2002, Barbara and Kyriaki filed their second petition for permanent guardianship of Ariana. Hearing on the petitions was eventually continued until May 22, 2003. On May 22, 2003, Mike's continuance request was denied. The May 22, 2002, hearing began with a somewhat jumbled discussion concerning possible settlement and an order to Mike, which was later qualified by the trial court, to remain in the courtroom. Eventually, Barbara testified she was the "Director at the Bienvenitos . . . Family Services in Los Angeles Child Welfare Agency" and had been "there" for 13 years. For the first year of her life, Ariana lived with her parents. But then Despina became ill with cancer. Once Despina became ill, Barbara related the following: "Ariana came to live with us the first year of her life at the end of 1996 when [Despina] was still living. She called me and asked me to come and get the baby because she could not care for her because she was getting ill. . . . [¶] So I took care of both [Despina] and Ariana for the year of 1997 until her passing of December 17[], 1997." Eventually, Mike, Barbara, and Kyriaki agreed as to Ariana's custody. Barbara testified: "[A]fter a few weeks we [met] with [Mike] . . . and we made a plan on how we were going to raise this child together because of the passing of [Despina]. And at that point we made a decision that we are going to have certain days with her and he was going to have certain days with her." At this point, Ariana was two years old. After Despina's death, the visitation plan broke down according to Barbara as follows: "[W]e were supposed to meet at the church to receive the child . . . . [W]e were waiting for him to bring back the child, as we had agreed. . . . [I]nstead, . . . some guy . . . drove up to me with a letter stating we were not going to see [Ariana] again." This then led to the temporary guardianship petition filed January 5, 1998, and the ensuing January 12, 1998, stipulated custody and parenting plan.

The January 12, 1998, order, which was judicially noticed at the May 22, 2003, hearing, states, "The child[] shall be in [Mike's] care during all time not designated below as Grandmother [and] AUNT[]'S time. [¶] [] GRANDMOTHER [AND] AUNT SHALL HAVE THE CHILD IN HER CARE AS FOLLOWS: [¶] [] Alternate weekends from Friday 4[] p.m. until Sunday 6[] p.m. commencing Jan[uary] 16, 1998. [Barbara] shall provide the transportation to and from [Mike's] residence [¶] [] Any additional time by mutual consent."

The trial court ruled: ". . . I want the minor back in Los Angeles County, under basically my custody and control, subject to my orders, and then we will proceed from there to determine this petition." Mike's counsel immediately responded: "We are in agreement with that . . . . [¶] We are willing to do that." The trial court ruled: it had jurisdiction; Barbara and Kyriaki had visitation rights; and Mike interfered with those visitation rights when he took Ariana to Greece. The trial court indicated that it intended to determine who should have custody and control of Ariana. The trial court ordered: Mike to return Ariana to Los Angeles County no later than June 16, 2003; Mike to deliver Ariana to Barbara and Kyriaki on June 21, 2003; and Barbara and Kyriaki to bring Ariana to court on June 25, 2003. The trial was then continued to June 25, 2003, to allow Mike to bring Ariana to Los Angeles County.

Ariana returned to Los Angeles. On June 25, 2003, the trial court appointed Mary K. Vo to represent Ariana. The trial court conducted an in camera hearing with Ms. Vo and Ariana. The trial court then stated that it intended to take testimony and issue an order providing for Ariana to attend school in Arcadia. The trial court agreed with Mike's contention that Ariana was Greek. However, the trial court stated that Ariana was also an American citizen and under the protection of California laws due to the fact that she had been born in Los Angeles. The trial court then stated: "Well, she has dual citizenship. I want to reach across or whatever. I think she lost something by not having her first year in the California public school with the English language. It seems to me she is a little shaky on that. We will wait and see. Maybe Greece is the best place for her. I don't know. [¶] I want to get her back to status quo ante where she is here for a year and we go from there."

Thereafter, Barbara continued to testify on the merits of the temporary guardianship petition filed September 5, 2002. Barbara testified that Ariana was born in January 1996. Ariana lived with Despina and Mike until the end of 1996. Barbara testified: "[Despina] called me and she asked me to come down and take Ariana home with me because she could not care for her. Her illness was getting worse. It was hard for her to care for the baby." Pursuant to Despina's request, Barbara picked up Ariana. Ariana lived with: Barbara; Kyriaki; Barbara's ex-husband; and Barbara's two children, Ilius and Gabriella. They resided in Barbara's home in Arcadia which she described as "pretty large." Barbara described the school district as "excellent."

Difficulties arose with Mike which ultimately led to a parenting plan in December 1997. Barbara described the plan as follows: "My mother met with him because I really felt like, you know, they needed to talk. . . . They

created this plan that she should stay with us during the week. He would take her on weekends. And that's what we came up with. It was just among us, no court order or anything like that."

During the lunch hour on June 25, 2003, the parties through counsel reached an agreement for an Evidence Code section 730 evaluation. The trial court accepted the stipulation and trailed the matter to July 2, 2003, to determine if an evaluator had been selected. The trial date was continued to September 24, 2003. Prior to closing the June 25, 2003 hearing, the trial court ruled without objection that all previous orders were to remain in full force and effect. The trial court ordered that Barbara and Kyriaki would have "custody" until July 2, 2003, and that Mike would then have custody for a week. These custody orders were made without objection.

On July 2, 2003, Mike, Barbara and Kyriaki, and their respective counsel, appeared in court. The trial court found that Ariana had been in the temporary physical custody of Barbara and Kyriaki since June 21, 2003. The trial court appointed Dr. Robin Drapkin, a psychologist, to perform an Evidence Code section 730 custody evaluation. The trial court also ordered: "Physical custody of [Ariana] shall be shared equally between the parties in two (2) week intervals as follows: Commencing on Saturday, July 5, 2003 at 12:00 noon to Saturday, July 19, 2003 at 12:00 noon, [Mike] shall have temporary physical custody of [Ariana]. From July 19, 2003 at 12:00 noon to August 1, 2003 at 12:00 noon, [Barbara and Kyriaki] shall have temporary physical custody of [Ariana]. Thereafter, the parties will continue to exchange temporary physical custody of [Ariana] in two (2) week intervals." The trial court further ordered that Ariana was not to be taken from California. Finally, the trial court ordered: "[Mike] is ordered to surrender [Ariana's] passport to his attorney of record, Cary Goldstein, Esq. Mr. Goldstein shall not release [Ariana's] passport to anyone without prior court order." The matter was then continued to September 24, 2003, for a review of Dr. Drapkin's custody evaluation. The order concerning the court's July 2, 2003, rulings was filed on July 25, 2003.

On July 16, 2003, Barbara and Kyriaki filed an ex parte application to modify the existing custody order and to grant them sole legal and physical custody and guardianship based on their belief Mike had taken Ariana to Greece. On July 21, 2003, Barbara and Kyriaki filed an ex parte application to modify the July 2, 2003, custody order. Barbara and Kyriaki sought sole physical and legal custody based on Mike's failure to deliver Ariana to them on July 19, 2003, as ordered by the trial court at the July 2, 2003, hearing.

Mike's attorney, Carry W. Goldstein, was present. Mr. Goldstein said that he was "especially appearing." To which the trial court replied: "You are not specially appearing, counsel. You are the attorney of record. You are not making any special appearance." Ms. Vo appeared on behalf of Ariana. Ms. Vo had no contact with Ariana.

The trial court found that Mike voluntarily absented himself from the jurisdiction. The trial court also rejected Mr. Goldstein's contentions that Mike had merely violated a visitation order. The trial court stated: "It is not a visitation order. I ordered custody transferred from one party to the other. Custody, physical custody not visitation. . . ." The trial court then shortened time for notice of hearing and set the matter for August 5, 2003. The trial court ordered Mr. Goldstein to advise Mike to appear at the August 5, 2003, hearing.

On August 5, 2003, Ms. Vo had been unable to speak with Ariana. Mr. Goldstein informed the court that Mike and Ariana were in Greece. The trial court subsequently rejected Mr. Goldstein's offer to present Greek documents showing that the paternal grandparents had been made Ariana's legal guardians. The trial court stated: "You are offering something for a [party] not in court and in violation of a court order. As a result of that, I will disallow the entry of that document in evidence. . . . [¶] That is the penalty imposed upon [Mike for failing to appear]."

On August 8, 2003, the trial court advanced and vacated the September 24, 2003, trial date. The trial court found: it first acquired jurisdiction over Ariana on January 5, 1998; Barbara and Kyriaki were the persons who assumed the role of Ariana parents on a day-to-day basis by providing for the child's physical and psychological needs; and granting custody to Mike would be detrimental to Ariana. The trial court then ordered Mike to return Ariana to Los Angeles. Further, Barbara and Kyriaki were awarded sole legal and physical custody of Ariana. On August 12, 2003, the trial court issued letters of guardianship to Barbara and Kyriaki. On August 29, 2003, Mike appealed from the August 8, 2003, order appointing Barbara and Kyriaki as Ariana's guardians. On September 8, 2003, Mike filed an amended notice of appeal from the orders denying his June 25, 2003, nonsuit motion and the August 8, 2003, decision appointing Barbara and Kyriaki as Ariana's guardians.

## III. DISCUSSION

### A. Jurisdiction

#### 1. Overview

■ Mike argues the trial court had no subject jurisdiction because of the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.[2]), Probate Code section 2201, or the Hague Convention on the Civil Aspects of International Child Abduction (the Hague Convention). Mike argues the trial court had no subject jurisdiction because of the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.[2]), Probate Code section 2201, or the Hague Convention on the Civil Aspects of International Child Abduction (the Hague Convention). Subject matter jurisdiction is conferred by constitutional or statutory law. (*Dial 800 v. Fesbinder* (2004) 118 Cal.App.4th 32, 42 [12 Cal.Rptr.3d 711]; *In re Marriage of Jensen* (2003) 114 Cal.App.4th 587, 593 [7 Cal.Rptr.3d 701]; *Marlow v. Campbell* (1992) 7 Cal.App.4th 921, 928 [9 Cal.Rptr.2d 516].) The Supreme Court has held, "Subject matter jurisdiction . . . is the power of the court over a cause of action or to act in a particular way." (*Greener v. Workers' Comp. Appeals Bd.* (1993) 6 Cal.4th 1028, 1035 [25 Cal.Rptr.2d 539, 863 P.2d 784]; *Dial 800 v. Fesbinder, supra*, 118 Cal.App.4th at p. 42; *Trafficschoolonline, Inc. v. Superior Court* (2001) 89 Cal.App.4th 222, 231 [107 Cal.Rptr.2d 412]; *People v. Jackson* (1983) 150 Cal.App.3d Supp. 1, 6–7 [198 Cal.Rptr. 135], overruled on a different point in *People v. Posey* (2004) 32 Cal.4th 193, 205, fn. 5 [8 Cal.Rptr.3d 551, 82 P.3d 755].) By contrast, the lack of subject matter jurisdiction means the entire absence of power to hear or determine a case; i.e., an absence of authority over the subject matter. (*Abelleira v. District Court of Appeal* (1941) 17 Cal.2d 280, 288 [109 P.2d 942]; accord *Greener v. Workers' Comp. Appeals Bd., supra*, 6 Cal.4th at p. 1035; *In re Marriage of Jensen, supra*, 114 Cal.App.4th at p. 593; *Buckley v. California Coastal Com.* (1999) 68 Cal.App.4th 178, 190 [80 Cal.Rptr.2d 562].) Where the evidence is not in dispute, a determination of subject matter jurisdiction is a legal question subject to de novo review. (*Warburton/Buttner v. Superior Court* (2002) 103 Cal.App.4th 1170, 1180 [127 Cal.Rptr.2d 706]; *Robbins v. Foothill Nissan* (1994) 22 Cal.App.4th 1769, 1774 [28 Cal.Rptr.2d 190]; *Finnie v. District No. 1-Pacific Coast Dist. etc. Assn.* (1992) 9 Cal.App.4th 1311, 1318 [12 Cal.Rptr.2d 348].)

#### 2. The Uniform Child Custody Jurisdiction and Enforcement Act and Probate Code section 2201

■ There is no merit to Mike's argument that the trial court did not have subject matter jurisdiction. The Uniform Child Custody Jurisdiction and Enforcement Act and Probate Code section 2201 provided the trial court with

---

[2] All further statutory references are to the Family Code unless otherwise indicated.

the authority to make the orders under review. In California, the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) overns custody matters, which include guardianship proceedings. (*Brossoit v. Brossoit* (1995) 31 Cal.App.4th 361, 368 [36 Cal.Rptr.2d 919]; *Guardianship of Donaldson* (1986) 178 Cal.App.3d 477, 487–489 [223 Cal.Rptr. 707].) The Uniform Child Custody Jurisdiction and Enforcement Act is the exclusive method of determining subject matter jurisdiction in California custody cases, including international custody disputes. (§ 3421; *In re Stephanie M.* (1994) 7 Cal.4th 295, 310 [27 Cal.Rptr.2d 595, 867 P.2d 706]; *In re C.T.* (2002) 100 Cal.App.4th 101, 106 [121 Cal.Rptr.2d 897]; *In re Nada R.* (2001) 89 Cal.App.4th 1166, 1173 [108 Cal.Rptr.2d 493].) Section 3402, subdivision (f) provides: " 'Court' means an entity authorized under the law of a state to establish, enforce, or modify a child custody determination." Section 3421 provides in part: "(a) Except as otherwise provided in Section 3424, a court of this state has jurisdiction to make an initial child custody determination only if any of the following are true: [¶] (1) This state is the home state of the child on the date of the commencement of the proceeding, or was the home state of the child within six months before the commencement of the proceeding and the child is absent from this state but a parent or person acting as a parent continues to live in this state. [¶] (2) A court of another state does not have jurisdiction under paragraph (1), or a court of the home state of the child has declined to exercise jurisdiction on the grounds that this state is the more appropriate forum under Section 3427 or 3428, and both of the following are true: [¶] (A) The child and the child's parents, or the child and at least one parent or a person acting as a parent, have a significant connection with this state other than mere physical presence. [¶] (B) Substantial evidence is available in this state concerning the child's care, protection, training, and personal relationships. [¶] (3) All courts having jurisdiction under paragraph (1) or (2) have declined to exercise jurisdiction on the ground that a court of this state is the more appropriate forum to determine the custody of the child under Section 3427 or 3428. [¶] (4) No court of any other state would have jurisdiction under the criteria specified in paragraph (1), (2), or (3). [¶] (b) Subdivision (a) is the exclusive jurisdictional basis for making a child custody determination by a court of this state. [¶] (c) Physical presence of, or personal jurisdiction over, a party or a child is not necessary or sufficient to make a child custody determination."

Section 3402, subdivision (c) defines a child custody determination as follows: " 'Child custody determination' means a judgment, decree, or other order of a court providing for the legal custody, physical custody, or visitation with respect to a child. The term includes a permanent, temporary, initial, and modification order. . . ." Section 3402 subdivision (d) states: "[A] '[c]hild custody proceeding' means a proceeding in which legal custody, physical custody, or visitation with respect to a child is an issue. The term includes a

proceeding for . . . guardianship . . . ." Section 3402, subdivision (e) defines the term "commencement" to mean "the filing of the first pleading in a proceeding." Section 3402, subdivision (g) provides in part: " 'Home state' means the state in which a child lived with a parent or a person acting as a parent for at least six consecutive months immediately before the commencement of a child custody proceeding. . . . A period of temporary absence of any of the mentioned persons is part of the period." Section 3402, subdivision (k) provides: " 'Modification' means a child custody determination that changes, replaces, supersedes, or is otherwise made after a previous determination concerning the same child, whether or not it is made by the court that made the previous determination."

■ Thus, a trial court has subject matter jurisdiction over guardianship matters when a petition is filed concerning a child, such as Ariana whose home state is California. Also, trial courts have subject matter jurisdiction when a child lives in California for six months before the petition is filed. (§§ 3402, subd. (g), 3421, subd. (a)(1); *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 310; *Taylor M. v. Superior Court* (2003) 106 Cal.App.4th 97, 109 [130 Cal.Rptr.2d 502]; *Guardianship of Lee* (1954) 123 Cal.App.2d 882, 885 [267 P.2d 847].) In this case, Kyriaki and Barbara had initially filed a guardianship petition on January 5, 1998. The trial court correctly found that the original guardianship proceeding was sufficient to establish jurisdiction to determine the custody issues concerning Ariana. In any event, the undisputed evidence established the trial court had resolved the custody issues concerning Ariana because California was her home until July 2002, two months prior to September 5, 2002, the date when the second guardianship petition was filed. (§§ 3402, 3421; *In re Stephanie M.*, *supra*, 7 Cal.4th at p. 310; *Taylor M. v. Superior Court*, *supra*, 106 Cal.App.4th at p. 109.)

■ Further, once the trial court had acquired subject matter jurisdiction in 1998, it continued to retain the authority to adjudicate the custody and visitation disputes among the parties in 2002 and 2003. The Supreme Court has held, "In situations involving guardianship and custody orders subsequent proceedings to obtain changes in custody are continuations of the original proceeding to determine custody." (*Jacobs v. Superior Court* (1959) 53 Cal.2d 187, 190 [1 Cal.Rptr. 9, 347 P.2d 9]; accord, *Haldane v. Haldane* (1962) 210 Cal.App.2d 587, 596 [26 Cal.Rptr. 670].) Once the trial court had jurisdiction in 1998, it retained the authority to consider the 2002 and 2003 petitions.

■ There is no merit to Mike's contention that the trial court did not have subject matter jurisdiction because of Probate Code section 2201. Probate Code section 2200 states, "The superior court has jurisdiction of guardianship and conservatorship proceedings." Probate Code section 2200 expressly

vested the trial court with subject matter jurisdiction over the guardianship claims of Barbara and Ariana. Probate Code section 2201, the statutory provision relied upon by Mike, which is entitled "Residents; venue" states, "The proper county for the commencement of a guardianship or conservatorship proceeding for a resident of this state is either of the following: [¶] (a) The county in which the proposed ward or proposed conservatee resides. [¶] (b) Such other county as may be in the best interests of the proposed ward or proposed conservatee." As can be noted, Probate Code section 2201 is a venue statute—not a jurisdictional provision. (Recommendation Proposing New Probate Code (Dec. 1989) 20 Cal. Law Revision Com. Rep. (1990) 1001, 1272.) Nothing in Probate Code section 2201 deprived the trial court of subject matter jurisdiction.

In this case, On January 5, 1998, Barbara and Kyriaki filed their temporary guardianship petition. On January 12, 1998, the stipulated-to conciliation court order providing Barbara and Kyriaki with visitation rights was signed. On March 11, 1998, an amended stipulation modifying the January 12, 1998, conciliation court agreement was filed. On September 5, 2002, Barbara and Kyriaki filed their temporary guardianship petition and order to show cause concerning a contempt. The September 5, 2002, temporary guardianship petition and contempt request was filed in the same case as the initial January 5, 1998, temporary guardianship petition. On July 2, 2003, the trial court made a "child custody determination" within the meaning of section 3402, subdivision (c). The July 2, 2003, order provided for shared custody of Ariana. Further, the trial court explicitly ordered all parties not to take Ariana from California. By the time Mike took Ariana to Greece in July 2003, the trial court had exercised its jurisdiction. (§ 3402, subd. (c).) Notwithstanding Mike's status as Ariana's father, the superior court had jurisdiction to make child custody determinations based on the visitation rights and physical custody of Barbara and Kyriaki prior to the removal of the youngster to Greece.

### 3. The Hague Convention

Mike argues the trial court had no subject matter jurisdiction because Barbara and Kyriaki failed to invoke their rights under the Hague Convention. We disagree with Mike's assertion that the potential Hague Convention remedies available to Barbara and Kyriaki prevented the trial court from ruling on the 2002 and 2003 guardianship petitions.

The goal of the Hague Convention is to protect children from the effects of their wrongful removal from their nation of habitual residence.

(Hague Convention, Preamble;[3] *Holder v. Holder* (9th Cir. 2002) 305 F.3d 854, 860; *Silverman v. Silverman* (8th Cir. 2001) 267 F.3d 788, 791.) The expressly stated primary objects of the Hague Convention are twofold. The first object is to secure the return of a wrongfully removed child who is retained in a nation who is a signatory to the treaty. The second object is to ensure that custody and visitation rights under the law of treaty signatories are respected by other parties to the Hague Convention. (Hague Convention, art. I;[4] *Furnes v. Reeves* (11th Cir. 2004) 362 F.3d 702, 710; *U.S. v. Ventre* (9th Cir. 2003) 338 F.3d 1047, 1052.) A judicially expressed purpose of the Hague Convention is to deter a parent from fleeing to another jurisdiction in search of a more favorable decision. (*Silverman v. Silverman* (8th Cir. 2003) 338 F.3d 886, 899; *Ohlander v. Larson* (10th Cir. 1997) 114 F.3d 1531, 1536.) The Hague Convention has been implemented by the adoption of 42 United States Code sections 11601 through 11610, the International Child Abduction Remedies Act. (*Silverman v. Silverman, supra*, 338 F.3d at p. 889; *Gonzalez v. Gutierrez*, (9th Cir. 2002) 311 F.3d 942, 944; Pub.L. No. 100-300 (Apr. 29, 1988) 102 Stat. 437.) The Department of State has identified the right of return of a wrongfully removed child as the "core" of the Hague Convention. (Pub. Notice No. 957, 51 Fed.Reg. 10494, 10507 (Mar. 26, 1986); Weiner, *Navigating The Road Between Uniformity And Progress: The Need For Purposive Analysis Of The Hague Convention On The Civil Aspects Of International Child Abduction* (2002) 33 Colum. Hum. Rts. L.Rev. 275, 362.)

■ The Hague Convention provides two methods to secure the remedy of the return of a child from a country that is a treaty signatory. The first method to seek the return of a child is in the courts. A Hague Convention judicial proceeding is commenced by the filing of petition in state or federal court. (42 U.S.C. § 11603(a)–(b); Hogoboom, Cal. Practice Guide: Family Law (The Rutter Group 2004) ¶ 7:657, pp. 7-230.2–7-230.3 (rev. # 1, 2004); see *Matter of Mohsen* (D. Wyo. 1989) 715 F.Supp. 1063, 1064.) The second method to seek the return of a child is administrative in nature. Title 42 United States Code section 11606 establishes a United States "Central Authority." President Ronald Reagan appointed the Department of State as the Central Authority for Hague Convention purposes. (Exec. Order No. 12648, 53 Fed.Reg. 30637 (Aug. 11, 1988); *Blondin v. Dubois* (2d Cir.

---

[3] The Preamble states: "Firmly convinced that the interests of children are of paramount importance in matters relating to their custody, [¶] Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access, [¶] Have resolved to conclude a Convention to this effect, and have agreed upon the following provisions. . . ."

[4] Article I of the Hague Convention states: "The objects of the present Convention are—[¶] a to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and [¶] b to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States."

2001) 238 F.3d 153, 159, fn. 7; *Diorinou v. Mezitis* (2d Cir. 2001) 237 F.3d 133, 136, fn. 2.) The Central Authority is authorized to seek the return of children from other signatory countries. (H.R. Rep. No. 100-525, 2d Sess. (1988) pp. 387–388 reprinted in 1988 U.S. Code Cong. & Admin. News, Legis. Hist., pp. 387–388, 394–395; Pub. Notice No. 957, 51 Fed.Reg. 10494, 10511–10513 (Mar. 26, 1986).) The State Department has promulgated regulations for its operation as the Hague Convention Central Authority. (International Child Abduction, 22 C.F.R. § 94.1 et seq. (2004); *Bromley v. Bromley* (E.D. Pa. 1998) 30 F.Supp.2d 857, 859, fn. 3; *Distler v. Distler* (D. N.J. 1998) 26 F.Supp.2d 723, 725, fn. 1.)

■ However, the existence of the Hague Convention process did not deprive the trial court of subject matter jurisdiction. This is in large part an issue of treaty interpretation. The United States Supreme Court has explained our duties in examining treaty language as follows: ' "[T]o alter, amend, or add to any treaty, by inserting any clause, whether small or great, important or trivial, would be on our part an usurpation of power, and not an exercise of judicial functions. It would be to make, and not to construe a treaty. Neither can this Court supply a *casus omissus* in a treaty, any more than in a law. We are to find out the intention of the parties by just rules of interpretation applied to the subject matter; and having found that, our duty is to follow it as far as it goes, and to stop where that stops . . . .' " (*Chan v. Korean Air Lines, Ltd.* (1989) 490 U.S. 122, 135 [104 L.Ed.2d 113, 109 S.Ct. 1676] citing *The Amiable Isabella* (1821) 19 U.S. 1, 71 [5 L.Ed. 191], original italics.) We apply the following standard of analysis of treaty language: "The clear import of treaty language controls unless 'application of the words of the treaty according to their obvious meaning effects a result inconsistent with the intent or expectations of its signatories.' *Maximov v. United States* (1963) 373 U.S. 49, 54 [10 L.Ed.2d 184, 83 S.Ct. 1054, 1963 C.B. 689]." (*Sumitomo Shoji America, Inc. v. Avagliano* (1982) 457 U.S. 176, 180 [72 L.Ed.2d 765, 102 S.Ct. 2374]; see Vienna Convention on the Law of Treaties, May 23, 1969, 1195 U.N.T.S. 331, arts. 31–32.) A treaty may be not be construed as preempting state law or any court procedures in the absence of a clear intent to do so. (*El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng* (1999) 525 U.S. 155, 175 [142 L.Ed.2d 576, 119 S.Ct. 662] [state law]; *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court for Southern Dist. of Iowa* (1987) 482 U.S. 522, 539 [96 L.Ed.2d 461, 107 S.Ct. 2542] [discovery of evidence].)

■ The unambiguous treaty language establishes that California retains the authority to conduct guardianship proceedings as occurred here notwithstanding the Hague Convention. Article 18 provides, "The provisions of this Chapter do not limit the power of a judicial or administrative authority to order the return of the child at any time." Article 29 states, "This Convention shall not preclude any person, institution or body who claims that there has been a breach of custody or access rights within the meaning of Article 3 or

from applying directly to the judicial or administrative authorities of a Contracting State, whether or not under the provisions of this Convention." Article 34 provides: "This Convention shall take priority in matters within its scope over the Convention of 5 October 1961 concerning the powers of authorities and the law applicable in respect of the protection of minors, as between Parties to both Conventions. Otherwise the present Convention shall not restrict the application of an international instrument in force between the State of origin and the State addressed or other law of the State addressed for the purposes of obtaining the return of a child who has been wrongfully removed or retained or of organizing access rights." (Fn. omitted.) (The reference to the "Convention of 5 October 1961" is to the Convention Abolishing the Requirement of Legislation for Foreign Public Documents, Oct. 5, 1961, T.I.A.S. No. 10072, which prescribes a method for certifying documents; a treaty entirely unrelated to the present proceedings. (See *Esposito v. Adams* (N.D. Ill. 1988) 700 F.Supp. 1470, 1479.) The Hague Convention language expressly allows other proceedings involving a child to proceed.

Further, Mike cites no authority for the proposition that the Hague Convention or title 42 United States Code section 11601 et seq. act to deprive state courts of considering the merits of a guardianship petition. Nothing in the Hague Convention or the various government documents before the Congress prior to the adoption of the International Child Abduction Remedies Act in 1988 supports Mike's assertion. (1988 U.S. Code Cong. & Admin News, Legis. Hist., pp. 386–403.) In fact, the United States Department of State's position is that articles 18, 29, and 34, those that are set forth *in haec verba* in the immediately preceding paragraph, allow aggrieved persons, such Barbara and Kyriaki, to pursue remedies outside of the Hague Convention. (Pub. Notice No. 957, 51 Fed.Reg. 10494, 10507 (Mar. 26, 1986)) ["[T]he aggrieved person may also pursue remedies outside the Convention"].) Finally, title 42 United States Code section 11603(h) expressly states, "The remedies established by the Convention and this Act shall be in addition to remedies available under other laws . . . ." There is no merit to Mike's argument that the Hague Convention deprived the trial court of subject matter jurisdiction.

B., C.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

---

*See footnote, *ante*, page 690.

## IV. DISPOSITION

The appeal is dismissed. Barbara K. and Kyriaki K. are to recover their costs on appeal from Mike K.

Armstrong, J., and Mosk, J., concurred.

On July 14, 2004, the opinion was modified to read as printed above.