Filed 6/26/15  In re L.L. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re L. L., a Person Coming Under the Juvenile Court Law. | C075958 |
| SACRAMENTO COUNTY DEPARTMENT OF HEALTH AND HUMAN SERVICES,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R. L.,<br><br>Defendant and Appellant;<br><br>A. S.,<br><br>Defendant and Respondent. | (Super. Ct. No. JD233732) |

R. L., mother of the minor L. L., appeals from the juvenile court's jurisdictional and dispositional orders finding the minor a dependent of the court, removing him from mother's custody, awarding sole legal and physical custody to father, A. S., with

1

visitation for mother, and terminating the dependency. (Welf. & Inst. Code,[1] §§ 300, 361.2, subd. (b)(1), 395.)

Mother contends: (1) the disposition order removing the minor from her care is not supported by substantial evidence of danger to the minor; (2) the placement order is not supported by substantial evidence and lacks the necessary findings; (3) the visitation order is not in the minor's best interests; and (4) the juvenile court erred in failing to ensure that the exit order was enforceable. We affirm and direct the juvenile court to file the exit order with the family law division in Sacramento County Superior Court.

BACKGROUND

On September 2, 2013, the five-year-old minor (born October 2007) and his two-month-old half sibling N. L. (born July 2013) were placed in protective custody after mother was admitted to the hospital for a mental health assessment and no one was available to take care of them. Two days later, the Sacramento County Department of Health and Human Services (department) filed a dependency petition for the minor alleging jurisdiction based on mother's current and prior mental health problems.

The September 2013 detention report related that mother's home was unkempt with soiled diapers, garbage, bags, and clothing strewn about and three-foot-high piles of clothing in the playroom/laundry room area. The children's toys were pushed against the walls with other bags and boxes. N. L.'s bassinet held folded laundry. The kitchen was disorganized and there did not appear to be any formula for N. L. The refrigerator held uncovered food and a significant amount of alcohol, which mother said belonged to her roommate.

Mother told the social worker she had gone to the emergency room to be assessed for postpartum depression. N. L.'s father J. B. was supposed to meet her and pick up the

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

children but he never showed up. Mother felt she had no other option except to take the children to the hospital with her. The children were placed in protective custody by the police because there was no one to take care of them.

At the emergency room, mother met with a psychiatrist, who advised her that her mental health issues required long-term care to control. She confirmed a previous diagnosis of depression, panic disorder, and posttraumatic stress disorder. She was on Paxil for a significant time but stopped taking it after she felt better. In the past, she had been prescribed Wellbutrin and Xanax for depression and anxiety but refused to continue taking them. She admitted a depressive episode in January 2012 that led to her being admitted to the emergency room for suicidal ideation and to a Child Protective Services investigation after the minor was placed with the maternal grandmother (grandmother). Mother admitted not complying with recommended mental health services.

N. L. was born at about 36 and a half weeks gestation. When he was discharged from the hospital on July 27, 2013, he weighed four pounds nine ounces. His first visit after discharge was on August 9, 2013. The doctor requested mother return with N. L. in five days for a weight check, but mother failed to return. On September 3, 2013, the social worker met the foster parent, who said N. L. had no apparent fat layer on his body, and his skin was hanging off his limbs.

The minor told the social worker that he was scared when mother "gets sad" like she did when he and his brother were removed. The minor was covered with insect bites, which he said were from mother's roommate's dog that was covered with fleas. He also told the social worker that the roommate drinks a lot of alcohol and once got drunk and was "mean to my mommy. He yelled at my mommy and told her to do something with me, but I don't remember what it was." The minor wanted to live with grandmother, but she did not have a bed for him.

On September 3, 2013, mother called the social worker and said she tried to get treatment for her mental health issues, but she was referred to another doctor who could

not treat her until September 17, 2013.  Mother was sobbing; the social worker referred her to the Sacramento County Mental Health Treatment Center for evaluation.

The minor's father, A. S., lived in the United Kingdom; notice of the dependency was sent to him through the British Embassy in San Francisco.

The minor and N. L. were detained by the juvenile court in September 2013.  The October 2013 jurisdiction and disposition report related another interview with mother in which she denied having suicidal iterations in the 2012 incident.  She denied the allegation that her failure to treat her mental health problems put her children at risk.  She realized she had a pattern of taking her medication after mental health episodes and then stopping taking it over time as she felt better, which would eventually lead to another episode.  She now realized that she must take her medication for the rest of her life.  She had been taking her medication for about three weeks and her mental health was better.

Mother said she did not know that it was mandatory for N. L. to go back to the doctor and have his weight checked.  She called the doctor's office after N. L.'s initial appointment, and they said not to come in until his two-month check up.  Mother had hoped to bring both children in at the same time, so she canceled one appointment, and then forgot.  Mother told the social worker that she believes she just becomes forgetful.  As J. B. was now fully committed to their relationship and parenting the children, everything was better.  She said they "will probably be together forever."

N. L.'s father J. B. confirmed mother's diagnosis of depression, panic disorder, and posttraumatic stress disorder.  Grandmother told the social worker that she believes mother is depressed and needs counseling.  She saw mother's dirty home and its flea infestation, which did not concern mother.  The minor had been covered in flea bites, some of which were infected.  Grandmother told mother to take the minor to a doctor, but mother seemed to be in denial of the matter's severity.  Grandmother eventually had to buy over-the-counter treatments for the minor's flea bites.  She also had concerns that mother was not taking the minor to the doctor for the regular well-child appointments.

4

Grandmother said she told mother she needed to take the minor to the doctor. It did not seem that mother was following through. She also was not sure if mother was neglecting the minor's diet and education.[2]

Mother and the minor had lived with grandmother for about eight months until mother angrily left after being told she had three months to get a place to live and a job. Grandmother believed things went downhill for mother after that. It was her impression that mother wants someone to take care of her.

The report provided details regarding a January 2012 child welfare referral from a mandated reporter regarding mother's prior depressive episode. Mother had told her health care provider that she wanted to jump off her balcony. Law enforcement placed mother on a section 5150 hold and she was taken to the hospital. The reporter stated mother's house was "disgusting." Garbage was piled up to the countertop in the kitchen, which also contained dirty dishes with rotten food on them. The bathroom had a fecal smell. Asked what he had to eat that day, the minor said a chocolate cookie. He appeared to be shaking when he was playing. The allegation of general neglect was deemed inconclusive, but mother signed a safety plan, agreed to call or visit grandmother or great grandmother if she was too stressed or nervous, promised to clean the house, and agreed to seek counseling. Mother also agreed that if she had a severe or long lasting mental health episode, she would seek medical help and inform grandmother.

Mother told the social worker that although she was currently taking her medication she had become very stressed and anxious, resulting in her becoming forgetful about her children's medical appointments. Realizing that she might have to take her medication for the rest of her life, mother expressed her desire to have a social

---

[2]     Mother told the social worker in a September 20, 2013 interview, that she was teaching the minor how to read and write. She did not plan on enrolling the minor (who would turn six in October 2013) into kindergarten until mid-October.

worker continue monitoring her compliance so that she does not become stubborn and stop taking her medication again. Mother and J. B. were starting a family. She was "freaking out" before because she had no help. In the future, she would take better care of her mental health because she had J. B. and "tons of support."

The social worker recommended sustaining the petition and continuing out-of-home placement with services for mother.

In October 2013, father (A. S.) made his first appearance in juvenile court and was granted presumed father status.

A November 2013 addendum report described a meeting with mother, J. B., grandmother, and department social workers to look at returning the children to mother and J. B. Mother and J. B. had agreed to comply with their case plans and provide the department with relevant information regarding mother's mental health and the children's care. A second addendum report indicated that mother and J. B. did not attend the children's medical appointments as directed. N. L. had been transported to the emergency room and diagnosed with an upper respiratory infection. He was prescribed an inhaler and steroids and given a follow-up appointment. At a visit to mother's home, the social worker found it smelled of cigarette smoke. Mother said J. B. smoked in the bedroom, which concerned the social worker as N. L.'s doctor said N. L. could not be around any cigarette smoke. Mother had formula for N. L. and necessities for the children. She showed the social worker her bottle of Paxil and said she was no longer taking Xanax as it made her sleepy and forgetful.

The department recommended returning the children to mother. It retained concerns, but they would mostly be mitigated by mother's continued compliance with the case plan. A December 2013 addendum report reiterated the recommendation to return the children to mother.

In January 2014, the juvenile court sustained the petitions as to the minor and N. L. and, at the department's request, struck an allegation in N. L.'s petition that he

failed to thrive in mother's care. The court continued the case for a contested dispositional hearing.

A February 2014 addendum report related that J. B. told a social worker in January 2014 he had broken up with mother a few days earlier. He told the social worker they fought a lot and it was not going to work. Although he denied any physical altercations between them, there were times when he tried to leave the home and mother would hold onto him to prevent him from leaving. During an argument in the car, mother opened the door and took off her seat belt. She closed the door but it did not latch properly, causing her to be thrown out of the car when J. B. turned the corner to go onto a side street.

The social worker briefly interviewed father in January 2014. He visited Sacramento in December 2013, staying with mother as she had separated from J. B. Father said that mother and J. B. had a lengthy history of altercations and have separated multiple times. Later that month, the social worker received an e-mail chain between mother and father, in which mother described J. B. as having anger outbursts before he moved out, writing that J. B. "got a little scary and got physical." The department now recommended continued placement in foster care for the children.

A fifth addendum report issued in March 2014. The social worker interviewed father at court in February 2014. Father had one week of contact with the minor in 2007 and no further contact until the minor's second birthday when he visited mother and the minor for four days. His next contact with the minor was once in October 2013 and two times in December 2013 when he came to Sacramento for court appearances. Father said he paid mother at least $400 a month in child support since the minor's birth even though there is no formal child support order. He asked for the minor's placement with him in England.

Father was born in Dewsbury, England, in 1980. He met mother playing an online video game in 2003. They communicated via phone and Internet through 2006 when

mother went to England to move in with him. She left England in 2007 during her pregnancy because she was homesick.

Father has a bachelor's and master's degree. He earned about $30,000 a year as an information technology technician. He lived with the paternal grandparents, who own a five-bedroom home and could provide daycare for the minor.

The department recommended placing the minor with father and terminating the dependency. Continued foster care placement was recommended for N. L.

Father was present at the contested disposition hearing. Mother arrived late. Mother objected to the proposed dispositional orders. Mother argued that placing the minor with father in England and terminating the dependency would deprive the juvenile court of jurisdiction and leave her adrift, as the matter would be subject to the control of English authorities.

The trial court awarded sole legal and physical custody to father, ordered weekly contact with mother via phone and Skype, and once annual physical contact with the parents sharing the costs, and dismissed the dependency. Additional visitation was allowed as the parents could arrange.

DISCUSSION

I

*Removal Order*

Mother contends the disposition order removing the minor from mother's care must be reversed because there was insufficient evidence of substantial danger to the minor. We disagree.

"A dependent child may not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [that] [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home . . . ." (§ 361, subd. (c), (c)(1).)

8

"In reviewing the sufficiency of the evidence on appeal, we look to the entire record to determine whether there is substantial evidence to support the findings of the juvenile court. We do not pass judgment on the credibility of witnesses, attempt to resolve conflicts in the evidence, or determine where the weight of the evidence lies. Rather, we draw all reasonable inferences in support of the findings, view the record in the light most favorable to the juvenile court's order, and affirm the order even if there is other evidence that would support a contrary finding. [Citation.] When the [juvenile] court makes findings by the elevated standard of clear and convincing evidence, the substantial evidence test remains the standard of review on appeal. [Citation.] The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the order. [Citations.]" (*In re Cole C*. (2009) 174 Cal.App.4th 900, 915-916.)

Mother claims the issue which put the minor at danger at the time of detention, mother's mental health, no longer existed at the time of disposition. According to mother, the two allegations in the dependency petition, that she was not compliant with her medications and had been hospitalized for a mental health evaluation in September 2013, had "long been resolved" by the date of the disposition. In support of her contentions, mother notes that the department recommended returning the minor to mother's care in the November 2013 and the December 2013 reports. Although the department changed this recommendation to out-of-home placement in the February 2014 report, mother argues that neither this report nor the March 2014 addendum asserted a proper basis for this change.

Mother has a history of mental health problems that manifest in breakdowns when she does not take her medications. These breakdowns in turn placed the minor at risk of neglect manifested in various ways, including neglecting to provide necessary medical care to both the minor and N. L., as we have described. Mother admitted she forgot medical appointments, and claimed she would become forgetful when nervous and

9

stressed, even while taking her medication. Because her compliance with her medication requirements was sketchy, as we discuss in more detail below, the juvenile court could reasonably infer that mother's problems with taking medical care of her children would be present to an even greater degree in the future. Failing to take a child to medical appointments presents a substantial risk of physical harm or illness to any child.

Mother's failure to consistently take her medication presented other threats to the minor. Less than two years before the incident leading to the dependency petition, mother was put on a section 5150 hold for suicidal iteration. The home presented as filthy and the minor had not been eating properly. While the referral was ultimately deemed inconclusive, mother signed a safety plan which she did not follow. Mother's failure to abide by one of the terms of the safety plan, informing grandmother if she had a severe mental health episode, led to the children's removal from her when she was hospitalized.

Again in the current dependency, mother had stopped taking her medication. The minor was covered with untreated flea bites, some of which were infected, and mother had refused to take him to the doctor. As before, the house was unkempt. While an unkempt home is not grounds for a child's removal, in this context, it is additional evidence of mother's neglect of her children's needs when she does not take her medication.

Mother admitted significant difficulty staying on her medication, at one point asking for extra supervision from the social worker. Discontinuing her medication and the ensuing mental health episodes is associated with a lack of support from others. J. B. was her primary support during the dependency. J. B.'s initial absence played a role in the incident leading to the dependency. J. B. was not living with mother when N. L. was born. Mother subsequently told the social worker that her depression is a product of stress and anxiety, but J. B. starting to participate in raising her children relieved her stress. She also said that everything was better when J. B. was fully participating in

10

raising the children, with their subsequent breakup, she no longer had this necessary support.

The juvenile court could reasonably infer that mother needed other people to help keep her on track and on her medication. Grandmother's information that mother wanted (and needed) caretaking also supported this inference.

The changed circumstance between the November 2013 report recommending the minor's return and the February 2014 report recommending his continued removal was the breakup between J. B. and mother. Not only did mother lose her support system, but the circumstances of the breakup also provided additional evidence of domestic violence between mother and J. B. Mother's e-mail to father described an incident of domestic violence before the breakup, and adds to concerns raised by the minor's prior statement that J. B. was at times mean to his mother. In addition, father told the social worker that mother and J. B. had a history of altercations and breakups. The incident in the car where mother was thrown out of the car during an argument with J. B., is additional evidence that domestic violence between J. B. and mother is not limited to the one incident related in her e-mail. This is substantial evidence allowing the trial court to conclude that the minor was at risk of witnessing further domestic violence if he was returned to mother.

" '[D]omestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it.' [Citation.] Children can be 'put in a position of physical danger from [spousal] violence' because, 'for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . .' [Citation.]" (*In re E.B.* (2010) 184 Cal.App.4th 568, 576.)

## II

### *Placement Order*

Mother contends there is insufficient evidence that placement with A. S. in the United Kingdom and dismissing the dependency was not detrimental to the minor. She also contends that the juvenile court failed to make statutorily required findings to place the minor with father and terminate the court dependency.

Section 361.2, states in pertinent part: "(a) When a court orders removal of a child pursuant to Section 361, the court shall first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child. . . . [¶] (b) If the court places the child with that parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents."

As with the findings addressed in subheading I, *ante*, we apply the deferential substantial evidence standard of review to the juvenile court's findings under section 361.2. (*In re John M.* (2006) 141 Cal.App.4th 1564, 1569-1570 (*John M.*).)

Mother likens this case to *John M.,* where, according to her, the juvenile court remanded the case for a new dispositional hearing after the agency failed to conduct an adequate investigation of the nonoffending parent. She asserts that the department's investigation of A. S. was inadequate, which in turn deprived the juvenile court of the information needed to determine whether placing the minor with him would be

12

detrimental to the minor. She accordingly concludes that substantial evidence does not support the juvenile court's finding of no detriment.

*John M.* addressed the opposite disposition from the one present here, a finding that placement with the nonoffending parent was detrimental to the minor. The Court of Appeal found that the minor had to be placed with the nonoffending parent unless there was a "detriment finding by clear and convincing evidence." (*John M., supra*, 141 Cal.App.4th at p. 1569.) The juvenile court found detriment based on the 14-year-old child's stated wish not to live with his nonoffending father, the child's relationship with his infant sister and members of his extended family, the child's lack of a relationship with his father, "the paucity of information" about his father, and the child's reunification plan with his mother. (*Id.* at p. 1570.) The appellate court found these factors insufficient to support a finding of detriment. (*Ibid*.)

The Court of Appeal also found that neither the agency nor the juvenile court explored alternative means of investigating the father, who lived in Tennessee. (*John M., supra*, 141 Cal.App.4th at pp. 1572-1573.) Because the father was "a parent, the appropriate investigation is a basic one, less rigorous than the investigation necessary for placement with a more distant relative such as a cousin. While [the father's] geographical distance from San Diego necessitates a greater effort to garner information, it should not subject him to greater scrutiny. The depth of investigation should be determined by the fact that he is John's parent, not that he lives in Tennessee." (*Id.* at p. 1573.)

Contrary to mother's contention, *John M.* actually supports the juvenile court's finding. Here, there is much more evidence about the nonoffending parent and even less evidence of detriment than in *John M.* A. S. was interviewed twice by the department, once briefly and a second time more extensively. The department was able to learn that A. S. had been committed to the minor since birth, supporting L. L. with regular voluntary support payments after mother took the minor and left the United Kingdom.

13

A. S.'s lack of contact with the minor was a matter of geography rather than choice. He had the means to support the minor, including daycare through the paternal grandparents. The minor in *John M.* was older than the minor in the present case, nearly 14 years old at the disposition hearing. (*John M., supra*, 141 Cal.App.4th at p. 1570.) He was "a troubled young man in need of services," having sustained physical abuse, not trusting adults, and with cognitive problems. (*Id.* at pp. 1570-1571.) By contrast, the record contains no evidence that the minor here has any special needs.

Nothing in the report suggests the minor's relation to mother is so close that he would be harmed by prolonged separation. Indeed, the minor expressed a preference for living with grandmother in his initial interview after detention. Likewise, the record does not support an inference that his relationship with his half sibling, who was less than a year old at disposition, was so close that separation would be detrimental to him. Given the evidence of father's fitness, and the lack of any evidence supporting detriment, substantial evidence supports the trial court's finding.

Mother also contends the juvenile court did not make the necessary findings on the record as required by section 361.2, subdivision (c).

Section 361.2 states in pertinent part: "(b) If the court places the child with that parent it may do any of the following: [¶] (1) Order that the parent become legal and physical custodian of the child. The court may also provide reasonable visitation by the noncustodial parent. The court shall then terminate its jurisdiction over the child. The custody order shall continue unless modified by a subsequent order of the superior court. The order of the juvenile court shall be filed in any domestic relation proceeding between the parents. [¶] . . . [¶] (c) The court shall make a finding either in writing or on the record of the basis for its determination under subdivisions (a) and (b)." A juvenile court may therefore place the child with the nonoffending parent and terminate the dependency if it makes a finding on the record that ongoing supervision is no longer necessary. (*In re Austin P.* (2004) 118 Cal.App.4th 1124, 1135.)

Mother notes the trial court did not make a finding that ongoing supervision pursuant to section 361.2, subdivision (b)(2) was not required. She claims this is a necessary finding, it should have been made on the record pursuant to subdivision (c), and the juvenile court's failure to make this finding was prejudicial error. She also contends the juvenile court failed to state on the record or in writing the basis of its decision placing the minor with A. S. and terminating the dependency.

At the disposition hearing, mother objected to the department's recommendation of granting custody to A. S. and terminating the dependency. She argued that doing so would leave mother without options and leave the minor at the "whim and control" of the authorities in England, and moving the minor to a foreign country and away from a mother with whom he was bonded would be detrimental to him. The juvenile court, which read and considered the department's reports, found that placement with father "would not be detrimental to the safety, protection or physical or emotional well being" of the minor, and that awarding legal and physical custody to father was in the minor's best interests. These reports, as related elsewhere in this opinion, contained substantial information regarding father's fitness as a parent for the minor.

"In these circumstances, the fact that the juvenile court did not expressly state 'there is no need for continuing supervision' is no grounds for reversing its otherwise proper ruling. [Citation.]" (*In re A.J.* (2013) 214 Cal.App.4th 525, 538, fn. omitted.) Where, as here, mother's counsel argued that granting sole legal and physical custody of the minor was detrimental to him and left him at the "whim" of English authorities, it is no great leap to conclude that the juvenile court considered whether ongoing custody supervision was necessary before deciding to award custody to father and terminate the dependency. Given the ample evidence supporting a finding that A. S. was loving, committed to parenthood, and able to provide a stable home for the minor, we will imply a finding that ongoing supervision was not necessary.

15

Nor will we reverse for the juvenile court's failure to put this finding or the factual basis for the disposition on the record, because mother did not object to these alleged errors.

"An appellate court ordinarily will not consider challenges based on procedural defects or erroneous rulings where an objection could have been but was not made in the trial court. [Citation.] Dependency cases are not exempt from this forfeiture doctrine. [Citations.] The purpose of the forfeiture rule is to encourage parties to bring errors to the attention of the juvenile court so that they may be corrected. [Citation.] Although forfeiture is not automatic, and the appellate court has discretion to excuse a party's failure to properly raise an issue in a timely fashion [citation], in dependency proceedings, where the well-being of the child and stability of placement is of paramount importance, that discretion 'should be exercised rarely and only in cases presenting an important legal issue.' [Citation.]" (*In re Wilford J.* (2005) 131 Cal.App.4th 742, 754.) When a trial court is required to make a finding on the record, failure to object to the absence of such a finding forfeits the contention on appeal. (*People v. Tillman* (2000) 22 Cal.4th 300, 303.)

The issue of the minor's placement and the termination of the dependency was contested at the disposition hearing. Mother's failure to object to the lack of findings on whether there was a need for ongoing supervision forfeits the contention on appeal.

III

*Visitation Order*

Mother contends that the juvenile court's visitation order was not in the minor's best interests. We disagree.

When placing the minor with the nonoffending parent and terminating the dependency, a juvenile court "may also provide reasonable visitation by the noncustodial parent." (§ 361.2, subd. (b)(1).) The power to determine the right and extent of visitation by a noncustodial parent in a dependency case, including orders issued when the

16

dependency case is terminated, resides with the juvenile court and may not be delegated to nonjudicial officials or private parties. (*In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1476.)

A visitation order "necessarily involves a balancing of the interests of the parent in visitation with the best interests of the child. In balancing these interests, the court in the exercise of its judicial discretion should determine whether there should be any right to visitation and, if so, the frequency and length of visitation." (*In re Jennifer G.* (1990) 221 Cal.App.3d 752, 757.) If a juvenile court "grants visitation, 'it must also ensure that at least some visitation at a minimum level determined by the court itself, will in fact occur.' [Citation.]" (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1505.) "[B]y failing to mandate any minimum number of monitored visits [within a stated period of time], the court's abstract recognition of [a parent's] right to visitation is illusory . . . ." (*In re S.H.* (2003) 111 Cal.App.4th 310, 319.)

"We review an order setting visitation for abuse of discretion. [Citation.]" (*In re R.R.* (2010) 187 Cal.App.4th 1264, 1284.) " 'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citations.]" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.)

Mother claims there is no substantial evidence that the visitation order is in the minor's best interests. She notes that her ability to visit the minor is contingent on her coming up with half the cost of travel to the United Kingdom, as the juvenile court's order specifies that the costs shall be split. She objects to the court's failure to require father to bring the minor to the United States to see mother, where he could also see his

17

half sibling, other relatives, or friends. She concludes that the "extremely limited visitation plan" is neither reasonable nor in the minor's best interests.[3]

The juvenile court's ability to craft the visitation order was limited by the considerable physical distance between mother and father. Where one parent lives in the United Kingdom and the other in California, physical visitation is necessarily limited absent highly unusual circumstances, like a parent with the time and resources to fly to the other country routinely. With no such circumstances present here, ordering more than one physical visit per year risked imposing a severe financial burden on one or both parents. One annual visit with the parents sharing the costs, with more as they can work out, is a reasonable response to this problem. The guaranteed annual visit ensures that visitation is neither illusory nor subject to the control of a party other than the juvenile court. Allowing the parents to arrange visits therefore is not an improper delegation of control over visits to either parent. Splitting the cost of the mandated visit is the fairest allocation of costs. Finally, mandatory weekly Skype and phone contact admirably increases contact between mother and the minor without incurring the burden of travel required for a physical visit. Given the very young age of N. L. and the lack of any evidence of a close bond between the minor and his half sibling, there was no need for the juvenile court to make extra accommodations for visitation between them. Accordingly, we conclude that this fair-minded, flexible visitation order was not an abuse of discretion.

---

[3] Mother also asserts that the juvenile court erred by failing to order an evidentiary hearing on the visitation issue. The authority mother cites for this proposition, *In re Michael W.* (1997) 54 Cal.App.4th 190, addressed the juvenile court's denial of the parent's request for an evidentiary hearing before terminating the dependency, making visitation orders, and transferring the matter to family court. (*Id.* at p. 192.) The juvenile court here made the visitation order following a disposition hearing at which mother was allowed to present evidence. Nothing more was required.

# IV

## *Exit Order*

Finally, mother contends the juvenile court prejudicially erred by failing to ensure that its exit order was enforceable. She asserts the juvenile court should have opened a family law case file and placed the exit order there. She also claims the juvenile court relied on an incorrect view that the California judiciary would retain jurisdiction after the minor was transferred to another country. Asserting jurisdiction may in fact lie with the courts in the United Kingdom, mother asserts the custody and visitation orders must be reversed.

When a juvenile court orders custody with the nonoffending parent and terminates jurisdiction, the court must prepare and file an exit order (Judicial Council Forms, form JV-200) in accordance with rule 5.700 of the California Rules of Court.[4] (Rule 5.695(a)(7)(A).) "The order of the juvenile court must be filed in an existing nullity, dissolution, legal guardianship, or paternity proceeding. If no custody proceeding is filed or pending, the order may be used as the sole basis to open a file." (Rule 5.700(a)(1).) The juvenile "court may direct the parent, parent's attorney, county counsel, or the clerk to: [¶] (A) Prepare the order for the court's signature; and [¶] (B) Transmit the order within 10 calendar days after the order is signed to the superior court of the county where a custody proceeding has already been commenced or, if none, to the superior court of the county in which the parent who has been given custody resides. [¶] (3) After receipt of the juvenile court custody order, the superior court clerk of the receiving county must immediately file the juvenile court order in the existing proceeding or immediately open a file, without a filing fee, and assign a case number." (Rule 5.700(a)(2), (3).)

---

**4**      Undesignated rules references are to the California Rules of Court.

19

Mother contends this framework requires the juvenile court to open a family law case file and place the exit order therein where none exists. We agree. The court erred in failing to do so because a termination order ends the juvenile court's jurisdiction. (*In re John W.* (1996) 41 Cal.App.4th 961, 973.) "The moment the juvenile court terminates the dependency proceedings, the child passes completely from the mandatory jurisdiction of the juvenile court, and the jurisdiction of the superior court, including the family law court, is available." (*In re Sarah M.* (1991) 233 Cal.App.3d 1486, 1504, disapproved on other grounds by *In re Chantal S.* (1996) 13 Cal.4th 196.) Although rule 5.700 contains the permissive term "may," we conclude that a juvenile court has a duty to use the exit order to form the basis of a new family law file when there is no ongoing nullity, dissolution, legal guardianship, or paternity proceeding. This allows the noncustodial parent a means for enforcing the custody order while effecting the termination of the juvenile court's jurisdiction. Because the parent with custody, father, lives in a foreign country, we shall direct the juvenile court to use the exit order to open a family law case file in Sacramento County Superior Court.

Mother contends that "within a matter of months" California is likely to lose subject matter jurisdiction over custody and visitation orders. This is not true because we are directing the opening of a family law file and the Uniform Child Custody Jurisdiction and Enforcement Act[5] (the Uniform Act) governs multistate child custody matters and its policies apply to international child custody disputes. (*Ocegueda v. Perreira* (2015) 232 Cal.App.4th 1079, 1081, 1084; *In re Stephanie M., supra*, 7 Cal.4th at p. 310.) Under the Uniform Act, the child's home state has jurisdiction to make the initial custody order (which happened here). (Fam. Code, § 3421, subd. (a)(1).)

---

[5] Family Code section 3400 et seq.

20

So long as mother resides in California, the minor, who has other family in California and will have frequent phone contact with her under the visitation order, will have a significant connection with the state, and the family court retains jurisdiction over custody and visitation. (*Kumar v. Superior Court* (1982) 32 Cal.3d 689, 696-698.)

Also there is a mechanism for enforcing the visitation order in a foreign country. The United States and the United Kingdom are signatories to the Hague Convention[6] (*Lebel v. Mai* (2012) 210 Cal.App.4th 1154, 1158, fn. 1), which is intended "to ensure that custody and visitation rights under the law of treaty signatories are respected by other parties to the Hague Convention. [Citations.]" (*Guardianship of Ariana K.* (2004) 120 Cal.App.4th 690, 705 (*Ariana K.*).) State and federal courts have concurrent jurisdiction over actions pursuant to the Hague Convention. (22 U.S.C. § 9003(a).)

Because California courts have retained jurisdiction over visitation and custody, mother has a means of enforcing her rights in a California or federal court.[7]

---

[6]     Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638 (Hague Convention).

[7]     In her reply brief, mother asserts two reasons that the Hague Convention is inapplicable here. She claims that it applies only to cases where the child was abducted from a parent's custody. Citing *Ariana K.*, she also asserts the Hague Convention is inapplicable because the Uniform Act is the sole means of recourse open to her. She is wrong on both counts.

The Hague Convention applies to children who are "wrongfully removed or retained within the meaning of the Convention." (22 U.S.C. § 9003(e)(A).) "The Hague Convention seeks 'to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, *as well as secure protection for rights of access*.' " (*Maxwell v. Maxwell* (4th Cir. 2009) 588 F.3d 245, 250, quoting Hague Convention, pmbl., 19 I.L.M. at 1501, italics added.) Courts effectuate this intent by "preserv[ing] the status quo." (*Miller v. Miller* (4th Cir. 2001) 240 F.3d 392, 398.) Thus, the Hague Convention ensures a parent's visitation rights. (*Ariana K., supra*, 120 Cal.App.4th at p. 705.) Not recognizing mother's visitation rights would therefore be unlawful retention

DISPOSITION

The orders of the juvenile court are affirmed.  The juvenile court is directed to open a family law case file in Sacramento County Superior Court with the exit order in accordance with rule 5.700.


                                                            ROBIE             , Acting P. J.


We concur:


       MAURO           , J.


       DUARTE        , J.

---

of the minor and would be subject to correction through an action under the Hague Convention.

*Ariana K.* involved the father's appeal from an order appointing the maternal grandmother and maternal aunt as the minor's guardians.  (*Ariana K., supra,* 120 Cal.App.4th at p. 694.)  The father here asserted the trial court did not have subject matter jurisdiction because the guardians did not invoke their rights under the Hague Convention.  (*Id.* at p. 704.)  The Court of Appeal held that the convention did not deprive the trial court of subject matter jurisdiction to consider the merits of the guardianship petition.  (*Id.* at p. 707.)  In so ruling, the *Ariana K.* court noted that the Hague Convention "expressly allows other proceedings involving a child to proceed." (*Ibid.*)

The Hague Convention is not a nullity.  It is an alternate means of enforcing the juvenile court's visitation order that also allows the family court to retain subject matter jurisdiction under the Uniform Act.

22